UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH KERRISSEY, III,<br><br>Defendant. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Criminal Action No. 24-cr-10106-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

On June 18, 2026, following a four-day trial, a jury found Defendant Joseph Kerrissey, III ("Kerrissey") guilty of three counts of wire fraud related to three Paycheck Protection Program ("PPP") loan applications he submitted in 2020 and 2021. [ECF No. 147]. Kerrissey previously moved for a judgment of acquittal at the close of the evidence, [ECF No. 143], which the Court denied, [ECF No. 146]. Currently before the Court are Kerrissey's renewed motion for a judgment of acquittal, [ECF No. 166], and motion for a new trial, [ECF No. 165]. For the following reasons, both motions are **DENIED**.

## I. BACKGROUND

### A. The Indictment

A grand jury returned an indictment in April 2024 charging Kerrissey with engaging in a scheme to defraud three banks (Funding Circle, TD Bank, and Customers Bank) by submitting false PPP loan applications on behalf of businesses that he owned, in violation of the wire fraud statute, codified at 18 U.S.C. § 1343. [ECF No. 17 ¶¶ 27–28]. At trial, the government alleged

that Kerrissey, in each of these loan applications, made three false assertions regarding: (1) whether he had been convicted of a felony involving fraud within the past five years; (2) whether he was on probation at the time of the application; and (3) how much the applicant businesses paid Kerrissey, their sole employee, each month. [Id. ¶¶ 15–26].

**B. Relevant Trial Evidence**

In reaching its verdict, the jury could have found the following, based on the evidence presented at trial. The Court presents these facts in the light most favorable to the verdict. See United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018). This summary is intended to provide an overview of events and is supplemented as necessary throughout the memorandum and order with information about specific exhibits and testimony.

1. Circumstances Predating the Loan Applications

The parties stipulated that Kerrissey pled guilty in June of 2018 to ten counts of larceny by check, and that the crime of larceny by check requires an intent to defraud. [ECF No. 156 ("Day 2 Trial Tr.") at 56–57]. The parties further stipulated that, as a result of these convictions, Kerrissey was sentenced to three years' probation, which lasted from June 5, 2018, to May 7, 2021, and that Kerrissey knew he was on probation throughout this period. [Id. at 57].

At trial, the government presented multiple forms of evidence establishing that Kerrissey and his businesses had little to no income in 2019. The government entered (1) bank account records for Kerrissey's businesses (of which he was the sole employee), JDHE Holding, LLC ("JDHE") and JK Snow Management, LLC ("JK Snow"), which reflected minimal income and no apparent payroll expenses for 2019, [Day 2 Trial Tr. at 67–68, 73–75, 84–85], and (2) Kerrissey's 2019 personal tax returns, in which he claimed only one dollar in adjusted gross income for the year. [Id. at 70]. The probation officer assigned to Kerrissey testified that

Kerrissey repeatedly failed to make payments in 2018 toward the $100,000 restitution he owed from his earlier convictions, [id. at 197–200], and that the state court in 2019 suspended a large part of his owed restitution due to an inability to pay the remaining amount. [ECF No. 157 ("Day 3 Trial Tr.") at 21].

2. Funding Circle Loan (Count I)

With regard to the Funding Circle loan, the subject of Count I, Charles Shevlin, an IRS Special Agent, testified that Exhibit 1 was a completed PPP loan application that Kerrissey signed on July 30, 2020, on behalf of JDHE, and which Funding Circle approved. [Day 2 Trial Tr. at 52–54, 62]. Kerrissey did not object to this testimony. [Id.].

On the loan application, in response to the question asking, in relevant part, whether "any individual owning 20 percent or more of the equity of the applicant" is "on probation or parole," Kerrissey answered "No." [Day 2 Trial Tr. at 55]. In response to the question asking, in relevant part, whether an owner of the applicant had been convicted "within the last five years, for any felony involving fraud, bribery, embezzlement, or a false statement in a loan application, or an application for federal financial assistance," Kerrissey also answered "No." [Id.].

In response to the application question asking the applicant business's average monthly payroll expenses, Kerrissey represented that JDHE paid him, the company's sole employee, $23,037.31 per month. [Day 2 Trial Tr. at 60]. Kerrissey supported these claimed expenses by submitting with the application a purported IRS Form 1040 that claimed $97,919 in adjusted gross income for Kerrissey personally in 2019. [Id. at 68–69]. Kerrissey also submitted a purported IRS Schedule C document that reported $189,005 in gross income and over $120,000 in profit for JDHE for 2019. [Id. at 71–72]. Kerrissey never filed either document with the IRS, and his actual filed tax forms for 2019 claim just one dollar in adjusted gross income. [Id. at 68–

70]. Special Agent Shevlin testified that the reported income and profit numbers for JDHE are inconsistent with the bank records he reviewed. [Id. at 72].

Further, Jesus Porras, an employee of the company that acquired Funding Circle after the relevant time period, testified regarding the loan application and approval. [Day 2 Trial Tr. at 168–73]. Like Special Agent Shevlin, Mr. Porras testified that Exhibit 1 was the loan application that Funding Circle approved in granting a PPP loan to JDHE. [Id. at 170]. Kerrissey did not object to that testimony. [Id.]. Mr. Porras further testified that if Kerrissey had answered "yes" to either of the questions regarding probation or convictions, the application would have been denied. [Id. at 172–73].

3. TD Bank Loan (Count II)

With regard to the TD Bank loan, the subject of Count II, Special Agent Shevlin testified that Exhibit 11, a completed PPP loan application Kerrissey signed on behalf of JK Snow on July 20, 2020, was the relevant loan application that TD Bank approved. [Day 2 Trial Tr. at 79–82]. Kerrissey did not object to this testimony. [Id.]. As with the Funding Circle loan application, Kerrissey answered "No" to the questions asking whether he was on probation and whether he had been convicted of a crime involving fraud within the last five years. [Id. at 81–82].

In response to the application question concerning the applicant business's average monthly payroll expenses, Kerrissey represented that JK Snow paid him, the company's sole employee, $5,359.83 per month. [Day 2 Trial Tr. at 82–83]. Kerrissey supported these claimed expenses by submitting with the application a purported IRS Form 1040 that claimed $102,878 in adjusted gross income for Kerrissey personally in 2019. [Id. at 86]. Kerrissey also submitted two purported IRS Schedule C documents that reported $70,654 and $85,654, respectively, in gross income for JK Snow for 2019. [Id. at 87]. Again, Kerrissey never filed either document

with the IRS, and the numbers they report far exceed the actual amounts Kerrissey reported to the IRS for 2019. [Id. at 86–87]. Special Agent Shevlin also testified that the reported income and profit numbers for JK Snow are inconsistent with the bank records he reviewed. [Id.].

Sheena Jarmon, an employee of TD Bank, then identified Exhibit 11 as the PPP loan application submitted by JK Snow and testified that the document was handwritten because it was a corrected version of an application that was initially submitted electronically. [Day 2 Trial Tr. at 142–43, 146]. Ms. Jarmon further testified that internal records indicated TD Bank utilized the purported 2019 Schedule C submitted by Kerrissey to confirm the asserted monthly payroll amounts. [Id. at 147–48]. Finally, Ms. Jarmon testified that if Kerrissey had answered "yes" to either of the questions regarding probation or convictions, or if TD Bank knew that Kerrissey had submitted false information, the application would have been denied. [Id. at 148–49].

4. Customers Bank Loan (Count III)

Count III pertained to the Customers Bank loan. Special Agent Shevlin testified that Exhibit 18, a completed loan application Kerrissey signed on April 26, 2021, on behalf of JK Snow, was the relevant loan application Customers Bank approved. [Day 2 Trial Tr. at 89–92]. Kerrissey again did not object to this testimony. [Id.]. As with the previous two loan applications, Kerrissey answered "No" to the question asking whether he had been convicted of a crime involving fraud within the last five years.[1] [Id. at 91]. Kerrissey again supported the business's claimed payroll expenses on this application by submitting a purported IRS Form 1040 that claimed $102,878 in adjusted gross income for Kerrissey personally in 2019, and a

[1] Exhibit 18, unlike Exhibits 1 and 11, did not contain a question regarding whether Kerrissey was currently on probation.

purported IRS Schedule C document that reported $70,654 in gross income for JK Snow for 2019, [id. at 92–93], neither of which was ever filed with the IRS, [id.].

Like Special Agent Shevlin, Jackilyn Davis, an employee of Customers Bank, testified that Exhibit 18 was the relevant approved loan application. [Day 2 Trial Tr. at 182–86]. Kerrissey did not object to that testimony. [Id.]. Ms. Davis further testified that if Kerrissey had answered "yes" to the question regarding criminal convictions, or if Customers Bank had known that the application's claimed gross income figures were false, the application would have been denied. [Id. at 186–88].

## II. MOTION FOR JUDGMENT OF ACQUITTAL

### A. Legal Standard

To prevail on a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, a defendant must "show that the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offenses beyond a reasonable doubt." United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018). The Court must "consider all the evidence . . . admitted" at trial, "even if the [C]ourt erroneously admitted some of that evidence." United States v. Martínez-Hernández, 118 F.4th 72, 80 (1st Cir. 2024) (quoting United States v. Santiago-González, 825 F.3d 41, 46 (1st Cir. 2016)), cert. denied, 146 S. Ct. 126 (2025). The Court does not "weigh the evidence or make any credibility judgments, as those are left to the jury." United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (citing United States v. Ayala-García, 574 F.3d 5, 11 (1st Cir. 2009)). Rather, it "resolve[s] all credibility disputes in the verdict's favor," id. (quoting United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)), and "examine[s] the evidence—direct and circumstantial—as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict,"

Meléndez-González, 892 F.3d at 17 (quoting United States v. Wyatt, 561 F.3d 49, 54 (1st Cir. 2009)).

The verdict will be upheld if it is "supported by a plausible rendition of the record." Merlino, 592 F.3d at 29 (quoting United States v. Bristol-Mártir, 570 F.3d 29, 38 (1st Cir. 2009)). "If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," the Court must reverse the conviction because "where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt." United States v. Burgos, 703 F.3d 1, 10 (1st Cir. 2012) (quoting United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995)).

**B. Discussion**

Each count of wire fraud required proof beyond a reasonable doubt of the following: (1) the existence of a "a scheme to defraud by means of false pretenses"; (2) "the defendant's knowing and willful participation in the scheme with the intent to defraud"; and (3) "the use of interstate wire communications in furtherance of the scheme." United States v. Condron, 98 F.4th 1, 19 (1st Cir. 2024) (quoting United States v. Buoi, 84 F.4th 31, 38 (1st Cir. 2023)). To be fraudulent, "a false representation must be material," id., which requires that it "had a natural tendency to influence, or [was] capable of influencing [its] target's decision," id. at 20 (quoting United States v. Cadden, 965 F.3d 1, 12 (1st Cir. 2020)).

Kerrissey raises several arguments in support of his motion for judgment of acquittal. First, he argues that a reasonable jury could not have found that the government proved beyond a reasonable doubt that the loan applications admitted into evidence (Exhibits 1, 11, and 18) were

the applications that the relevant banks relied upon to grant PPP loans to Kerrissey. [ECF No. 166 at 2–5]. Second, he argues that a reasonable jury could not have found that the government proved beyond a reasonable doubt that any of Kerrissey's answers to the loan questions were false. [Id. at 5]. Third, he argues with respect to Count II that a reasonable jury could not have found that the government proved beyond a reasonable doubt that Kerrissey knew or should reasonably have known that the TD Bank loan would involve an interstate wire communication, at least under the theory alleged in the indictment. [Id. at 5–6].

Although the Court considers these arguments cumulatively for their effect on the soundness of the jury's verdict, it will address them sequentially for analytical clarity and convenience.

1. The Admitted Applications

Kerrissey's first argument—and the argument to which he devotes the most attention in his brief—is that the government failed to prove that the loan applications admitted at trial were the relevant applications relied upon by the banks in approving Kerrissey's PPP loans. [ECF No. 166 at 2–5]. Thus, according to Kerrissey, the government failed to prove that any falsehoods contained in these admitted loan applications were material. [Id.].

As an initial matter, this argument fails as a matter of law because "the government did not need to prove that [the decisionmakers] 'actually relied on the falsehood,'" but, rather, merely that the falsehoods at issue "had a natural tendency to influence, or [were] capable of influencing [their] target's decision." Condron, 98 F.4th at 19–20. Kerrissey does not dispute that a rational jury could conclude that he signed each of the loan applications at issue, or that he submitted them to banks with the intent of obtaining a PPP loan, or that a completed loan application has a "natural tendency to influence," id., a bank's loan-making decision. Given

those facts, it is immaterial whether the loan applications admitted at trial were the exact applications that resulted in payments to Kerrissey.

Regardless, however, the jury had ample evidence to conclude that Exhibits 1, 11, and 18 were the relevant loan applications approved by the banks. Special Agent Shevlin testified, without objection from Kerrissey, that the relevant bank approved each of these three loan applications. See [Day 2 Trial Tr. at 53, 80, 90]. Employees of Funding Circle and Customers Bank also testified, again without objection, that the applications admitted into evidence were approved. [Id. at 170, 185–86]. And an employee of TD Bank testified that the fraudulent tax forms submitted with the TD Bank application were relied upon by the bank, indicating that that application was approved as well. [Id. at 147–48]. The jury was entitled to accept these witnesses' testimony as true. See Merlino, 592 F.3d at 29 ("[C]redibility judgments . . . are left to the jury.").

Kerrissey also raises specific arguments pertaining to each of the loan applications admitted at trial, none of which are availing.

With regard to the Funding Circle loan, Kerrissey argues that the evidence weighs against Exhibit 1 being the approved loan application because the amount Funding Circle ultimately approved differs from the amount requested in Exhibit 1, and because Kerrissey's email correspondence with Funding Circle indicates that he submitted at least two applications. [ECF No. 166 at 3]. The very communications Kerrissey cites, however, confirm that the approved loan was based off Kerrissey's request for $57,000—i.e. the loan application in Exhibit 1—and was merely reduced in size to conform with a mandatory cap under the PPP program. [ECF No. 170 at 3]. This evidence therefore did not preclude a rational jury from finding that Exhibit 1 was the application approved by Funding Circle.

With regard to the TD Bank loan, Kerrissey argues that the evidence weighs against Exhibit 11 being the approved loan application because certain TD Bank documents reference an application date for Kerrissey that predates the creation date of Exhibit 11, and because Exhibit 11 is handwritten, contrary to TD Bank's application policies. [ECF No. 166 at 4]. The testimony of a TD Bank employee, however, clearly explained these purported discrepancies: Exhibit 11 is a handwritten corrected version of an earlier-submitted online loan application, the creation of which is consistent with TD Bank's policies. [Day 2 Trial Tr. at 146]. Thus, although Exhibit 11 was not the originally submitted application, the evidence was more than sufficient for the jury to find that it was the operative application that TD Bank ultimately approved.

Finally, with regard to the Customers Bank loan, Kerrissey argues that the testimony of the Customers Bank employee was insufficient to establish that Exhibit 18 was the correct application because "the prosecutor only showed [her] one application without asking if there were other versions for this borrower." [ECF No. 166 at 5–6]. The weight to be given this witness's testimony, however, was a matter for the jury to decide. The Court will not second-guess the jury's decision to accept that testimony. See [Day 2 Trial Tr. at 185–88].

Accordingly, although the government did not need to prove that the relevant banks actually relied upon the fraudulent loan applications introduced into evidence, a rational jury could have found that the government proved as much beyond a reasonable doubt.

2. Falsity

Kerrissey's second argument, to which he devotes only a single paragraph, is that "the Government did not prove beyond a reasonable doubt that any answer was false." [ECF No. 166

at 5]. He briefly, albeit unpersuasively, raises arguments pertaining to each of the loan questions relied upon by the government.

Kerrissey first asserts that because the questions concerning previous convictions were ambiguous, his "no" answers were not technically false. To the contrary, the Funding Circle and Customers Bank applications unambiguously asked whether Kerrissey had been convicted of "any felony involving fraud" within the past five years, [Day 2 Trial Tr. at 55, 91], and the TD Bank application asked, even more broadly, whether he had been convicted of "any felony," [id. at 82]. Kerrissey's contention that he misunderstood the language when answering "no" is without basis in the applications' language or the record and in any event not a basis to overturn the jury's verdict.

With regard to the probation questions, Kerrissey relies on the fact that the question had been "eliminated" by new regulations "by the time Mr. Kerrissey applied for the loans." [ECF No. 166 at 5]. This argument, however, does not negate the fact that Kerrissey's answers to these questions were false when made. Nor does it negate materiality, as the fact that the federal government made probation status non-disqualifying did not prevent private banks from considering it when deciding whether to issue PPP loans. See Profiles, Inc. v. Bank of Am. Corp., 453 F. Supp. 3d 742, 752 (D. Md. 2020) ("The [CARES Act] statutory language does not constrain banks such that they are prohibited from considering other information when deciding from whom to accept [PPP loan] applications . . . ."). Representatives of each of the relevant banks testified that they would have denied the loans if they had known that Kerrissey was on probation. [Day 2 Trial Tr. at 145, 148, 172–73]. Therefore, regardless of the official eligibility criteria operative at the time, the jury was entitled to find that Kerrissey's misrepresentations about his probation status were material to the decisions on his loan applications.

Finally, with regard to his answers about finances, Kerrissey only briefly asserts, without elaboration, that the government "relied on incomplete and outdated information." [ECF No. 166 at 5]. To the contrary, the government provided ample evidence to warrant the jury's conclusion that Kerrissey misrepresented his financial status, including (1) business bank account records showing the absence of the payroll expenses he claimed, [Day 2 Trial Tr. at 67–68, 73–75, 84–85]; (2) the negligible income Kerrissey reported to the IRS in 2019, [id. at 70]; (3) the apparently forged tax records Kerrissey submitted in support of his loan applications, [id. at 68–72, 86–87]; and (4) the fact that he was largely unable to make restitution payments in 2018 and 2019, [id. at 199–200]; [Day 3 Trial Tr. at 21].

Accordingly, a rational jury could have found that the government proved beyond a reasonable doubt that the loan applications Kerrissey submitted to the relevant banks contained material false statements.

3. Interstate Wire Communication

Kerrissey's final argument, asserted only with respect to Count II, is that the government did not meet the wire fraud statute's interstate wire communication requirement because it did not prove that Kerrissey knew or should have known that TD Bank would use an out-of-state company, Salesforce, to store his application information. [ECF No. 166 at 5–6]. The Court again disagrees.

The First Circuit has held that while the wire fraud statute requires a reasonably foreseeable interstate wire communication to occur, the defendant need not be on notice of "the interstate nature of the wire transmission[]." United States v. Tum, 707 F.3d 68, 73 (1st Cir. 2013). Thus, the government only needed to prove it was foreseeable to Kerrissey that "a wire communication would be made to further the scheme," not that the "communication would cross

state lines." Id. at 73–74. Here, a rational jury could easily find that Kerrissey had reason to believe that a wire communication would occur in connection with the processing of his loan application. It is undisputed that Kerrissey submitted his loan applications online, during a pandemic where bank employees were working remotely. "[N]o one can deny that electronic communications go on all the time today . . . particularly in the world of banking." Id. at 74. Thus, "a sensible person in [Kerrissey's] position should have anticipated that wire transmissions . . . would follow—at least a reasonable factfinder using 'common sense' could so conclude, which is all that is required."[2] Id.

Accordingly, a rational jury could have found that the government proved the wire fraud statute's interstate wire communication requirement beyond a reasonable doubt.

## III. MOTION FOR NEW TRIAL

### A. Legal Standard

On a motion for a new trial under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

A court may grant a new trial based on its "evaluation of the weight of the evidence" if it is "quite clear that the jury has reached a seriously erroneous result." Merlino, 592 F.3d at 32.

---

[2] Although it is irrelevant whether Kerrissey anticipated the "interstate nature of the wire transmission[]," Tum, 707 F.3d at 73, a rational jury could nonetheless have found that a person in Kerrissey's position should reasonably have anticipated that the digital transmissions involved in a loan application to TD Bank would cross state lines, given the frequency with which modern online transactions, particularly those related to banking, involve numerous remote intermediaries and other third parties (e.g. third-party servers, hosting platforms, vendors, clearinghouses, etc.). See United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) ("[J]urors are neither required to divorce themselves from their common sense nor to abandon the dictates of mature experience.").

In doing so, "district courts may 'weigh the evidence and evaluate the credibility of witnesses, . . . [but] the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict.'" Id. (quoting United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001)).

Courts may also grant a new trial based on prosecutorial misconduct during trial, United States v. Canty, 37 F.4th 775, 791 (1st Cir. 2022), or the improper admission of evidence, United States v. DiMasi, 810 F. Supp. 2d 347, 362 (D. Mass. 2011). When reviewing a request for a new trial based on prosecutorial misconduct, the Court considers "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant[ ]." Canty, 37 F.4th at 791 (quoting United States v. Vázquez-Larrauri, 778 F.3d 276, 283 (1st Cir. 2015)). Courts may grant a new trial based on improperly admitted evidence "if an error concerning the admission of evidence was made and the error was not 'harmless.'" DiMasi, 810 F. Supp. 2d at 362 (quoting United States v. Wilkerson, 251 F.3d 273, 280 (1st Cir. 2001)). An error is harmless "if it is highly probable that the error did not contribute to the verdict." Id.

When a defendant fails to raise a contemporaneous objection to a prosecutor's conduct or to the admission of evidence during trial, the district court applies the plain error standard to post-trial motions based on such conduct or evidence. See United States v. Vavic, 139 F.4th 1, 21–22 (1st Cir. 2025) (reversing grant of new trial where district court failed to properly apply plain error standard to prosecution argument); see Fed. R. Evid. 103; 3B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 842 (4th ed.) ("Defendants cannot gamble with the jury by letting error go by unremarked and then seek a new trial on the basis of the error

if the verdict turns out to be unfavorable."). "To show plain error, defendants must demonstrate '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" Canty, 37 F.4th at 790 (quoting United States v. Solís-Vásquez, 10 F.4th 59, 64 (1st Cir. 2021)). "The third prong of plain error review, that an error affects a defendant's substantial rights, generally requires the defendant to 'show a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" Id. (quoting Rosales-Mireles v. United States, 585 U.S. 129, 134–35 (2018)).

**B. Discussion**

Kerrissey raises numerous arguments for a new trial. Most are based on purportedly misleading, confusing, or irrelevant evidence or argument that was presented at trial, though some appear to be questioning the sufficiency of the evidence underlying the jury's verdict. Again, although the Court considers the cumulative effect of these purported errors, it will address each argument in turn for analytical clarity and convenience.

1. Evidence of April 2020 PPP Application Form

Kerrissey first asserts that the government introduced and spent time questioning a witness about a PPP loan application form which was outdated at the time Kerrissey submitted his loan applications. [ECF No. 165 at 3]. Because Kerrissey's counsel did not object to the admission of this application form, [Day 2 Trial Tr. at 11–12], or to the portions of testimony with which he now takes issue, [id. at 11–19], the Court reviews the admission of this evidence and testimony for clear error. Fed. R. Evid. 103.

The Court finds no error here, let alone clear error. Even though the question about probation status was no longer part of the official government-issued PPP application form by

the time Kerrissey submitted his applications, two of the three relevant banks still asked and considered that question in evaluating Kerrissey's loan application. [Day 2 Trial Tr. at 55, 81, 148, 172–73]. This form, and the related testimony, was therefore relevant and admissible. Moreover, even if it were not, the Court sees no likelihood that this exhibit or testimony could have affected the jury's verdict. Canty, 37 F.4th at 790.

2. Failure to Admit Additional Applications

Kerrissey next claims that the government did not adduce evidence that the applications it introduced were the ones the banks approved. [ECF No. 165 at 4]. The Court construes this argument as challenging the sufficiency of the evidence underlying the jury's verdict. Merlino, 592 F.3d at 31. For the reasons discussed at length above in relation to Kerrissey's motion for judgment of acquittal, see supra Part II.B.1, the jury had ample evidence to conclude that the loan applications introduced were the ones approved, and in any event, such a finding was unnecessary to sustain its verdict.

3. Argument Concerning Probation Question

Kerrissey contends that the government improperly argued that he committed fraud by answering "no" to the probation questions present on two of his three PPP loan applications. [ECF No. 165 at 5]. He contends that this argument was improper because the probation question was no longer part of the official government application form at the time of Kerrissey's applications, making his answer immaterial. [Id.]. Again, based on the Court's review of the record, it does not appear that Kerrissey's counsel objected to the government making this argument, so the Court reviews it for clear error. See Vavic, 139 F.4th at 21–22.

The Court finds no error in this argument from the government because, once again, the relevant banks still asked and considered the probation question in evaluating Kerrissey's loan

applications, and his answers were therefore material and a proper subject of prosecution argument. [Day 2 Trial Tr. at 55, 81, 148, 172–73]. Moreover, even if these answers could not themselves sustain a wire fraud verdict, each of the loan applications contained numerous unrelated material misstatements, so the Court sees no "reasonable probability that, but for the error, the outcome of the proceeding would have been different." Canty, 37 F.4th at 790 (quoting Rosales-Mireles, 585 U.S. at 134–35).

4. Evidence of IRS Schedule C Regulations

Kerrissey's next issue is that the prosecution "misled the jury with respect to the rules governing Schedule C applicants." [ECF No. 165 at 6]. A Schedule C is a tax form for individuals to report business income from sole proprietorships. Kerrissey submitted purported Schedule C forms with his PPP applications but never filed such forms with the IRS. He argues that the government misled the jury by (1) introducing testimony that incorrectly suggested that because Kerrissey failed to file a Schedule C with the IRS, it was improper to submit one with his PPP application, and (2) introducing testimony that improperly insinuated that Schedule C filers, like him, had an incentive to inflate their income beyond $100,000 per year in applying for PPP loans. [Id. at 6–7]. Once again, Kerrissey did not object to the testimony with which he now takes issue, [Day 2 Trial Tr. at 22, 25], so the Court reviews it for clear error. Fed. R. Evid. 103.

The Court again sees no basis for granting a new trial based on this argument. Even assuming, arguendo, that certain testimony about the Schedule C regulations was misleading, the issues involved in that testimony played a miniscule role at trial. The government did not base any of its fraud theories on Kerrissey's failure to follow regulations in submitting a Schedule C form. The fact that PPP loans for Schedule C filers considered only up to $100,000 of income

does not negate Kerrissey's motive to inflate his income, as the government produced ample evidence that his income fell well below $100,000. Therefore, the Court finds no likelihood that this testimony affected the jury's verdict, Canty, 37 F.4th at 790, and even if the clear error standard did not apply, any error was "harmless," DiMasi, 810 F. Supp. 2d at 362.

5. Evidence of Kerrissey's Financial Conditions

Kerrissey avers that the government introduced misleading testimony and evidence regarding his financial condition, which was relevant to proving that the income reported on the PPP applications was inflated. [ECF No. 165 at 7–8]. Once again, Kerrissey's counsel did not object to any of the testimony with which he now takes issue, [Day 2 Trial Tr. at 199]; [Day 3 Trial Tr. at 17, 21]; [Day 4 Trial Tr. at 7], or to the exhibit (Exhibit 45) which he now claims should not have been allowed into evidence, [Day 2 Trial Tr. at 52], so the Court reviews their admission for clear error. Fed. R. Evid. 103.

Again, the Court finds no error, clear or otherwise. All of Kerrissey's arguments go to the weight of the financial evidence introduced by the government, not to its admissibility. Its admission was therefore fully proper. To the extent Kerrissey argues that this evidence was insufficient to sustain the jury's verdict, the Court has already explained how the jury had more than enough evidence to permissibly find that Kerrissey lied about his income. See supra Part II.B.2.

6. Argument Concerning EIDL Applications

Kerrissey next contends that the government improperly argued in closing that the denial of Kerrissey's applications for Economic Injury Disaster Loans ("EIDLs")—a different type of loan administered by the Small Business Association—motivated him to lie on his PPP loan applications. [ECF No. 165 at 9]. Kerrissey avers that this argument was improper because his

first EIDL application was denied the same day he applied for his first PPP loan, so it could not have served as motive, and also because the loans were denied because of Kerrissey's credit history, not his criminal convictions. Again, Kerrissey's counsel did not object to this argument at the time, [Day 4 Trial Tr. at 8], so the Court reviews it for clear error.

Nothing about this argument provides a basis for granting a new trial. Even assuming, arguendo, that such argumentation was improper, the timing of Kerrissey's EIDL application denial was, at most, a passing issue at trial, and the government devoted all of one sentence to this argument in its closing. [Day 4 Trial Tr. at 8]. Given how minor and tangential it was to the core issues involved in establishing Kerrissey's guilt, the Court sees no reasonable possibility that this brief statement could have affected the verdict, Canty, 37 F.4th at 790, and even if the clear error standard did not apply, any error was "harmless," DiMasi, 810 F. Supp. 2d at 362.

7. Argument Concerning Interstate Wire Communication

Kerrissey's final issue is that the government improperly argued that the jury could choose from among multiple wire transmissions to reach a guilty verdict, rather than deciding whether the government proved the wire transmission alleged in the indictment. [ECF No. 165 at 9–10]. Again, Kerrissey did not object to this argument, [Day 4 Trial Tr. at 19–20], so the Court reviews it for clear error.

The Court finds no error. The government produced more than sufficient evidence of an interstate wire communication between TD Bank and Salesforce, just as it alleged. Therefore, the Court sees no reasonable likelihood that the verdict would have been different absent this argument. Canty, 37 F.4th at 790. Moreover, even if the verdict depended on interstate wire transmissions other than those alleged in the indictment, "[a] variance alone . . . does not necessitate disturbing a conviction," and is "grounds for reversal only if it is prejudicial," United

States v. Chan, 981 F.3d 39, 52 (1st Cir. 2020), such as if it causes the defendant to "receive inadequate notice of the charge against him and thus be taken by surprise at trial." Id. (quoting U.S. v. Dellosantos, 649 F.3d 109, 125 (1st Cir. 2011)). Given that Kerrissey did not offer substantial argument at trial concerning the interstate wire communication element, the Court sees no prejudice to him from any variance that occurred, so this argument is unavailing regardless of whether the clear error standard applies.

## IV. CONCLUSION

Considering all of Kerrissey's arguments for acquittal collectively, the Court finds that a "plausible rendition of the record" supports the jury's verdict. Merlino, 592 F.3d at 29 (quoting Bristol-Mártir, 570 F.3d at 38). Considering all of Kerrissey's arguments for a new trial collectively, the Court finds that the "interest of justice" does not require a new trial. Fed. R. Crim. P. 33. Accordingly, and for the foregoing reasons, Kerrissey's motions for judgment of acquittal, [ECF No. 166], and for a new trial, [ECF No. 165], are **DENIED**.

**SO ORDERED.**

November 13, 2026

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE